**Kathy SMOTHERS, Plaintiff,**

**v.**

**Celeste BENITEZ, the Secretary of Education; Dalia Landron de Perez; Jose Lema Moya, and the Department of Education of Puerto Rico, Defendants.**

**Civ. No. 91–1256 (JAF).**

United States District Court,
D. Puerto Rico.

May 13, 1992.
Order Nov. 17, 1992.

Erick Morales, Bayamón, P.R., for plaintiff.

Guillermo Macari, Trial Atty., Federal Litigation Div., Dept. of Justice, Com. of P.R., San Juan, P.R., for defendants.

1. § 51. Official languages

In all the departments of the Commonwealth Government and in all the courts of this island, and in all public offices the English language and the Spanish language shall be used indiscriminately; and, when necessary, translations and oral interpretations

OPINION AND ORDER

FUSTE, District Judge.

Plaintiff is a magna cum laude, 1989 Interamerican University graduate, with an Education major in the English Education Program. The program, approved by Puerto Rico's Council on Higher Education as offered by Interamerican, was at all times structured and taught in English. Plaintiff, an English-monolingual U.S. citizen, pursued her studies to work as a teacher in Puerto Rico. At the time of her May 1989 graduation, Puerto Rico was officially a bilingual jurisdiction, where Spanish and English were the two recognized languages. 1 L.P.R.A. § 51.[1] Such bilingualism was logical, respecting for eighty-nine years the blend between the various characteristics that made Puerto Rico a Commonwealth of the United States through a voluntary accord between the federal government and Puerto Rico. The local government of Puerto Rico was free to manage its own affairs, while at the same time linked to the United States and, hence, a part of the federal political structure. *See Historical Documents, Federal Relations and Constitution*, Vol. I, Laws of Puerto Rico Annotated, Equity Publishing Company (1982 ed.).

Bilingualism, that is, indiscriminate use of Spanish and English, permeates the Puerto Rico Constitution, which conforms to the federal model, and which has been approved by the United States and by Puerto Rico. *See Historical Documents, Establishment of the Commonwealth of Porto Rico and the Constitution*, pp. 134–35, Vol. I, Laws of Puerto Rico Annotated, Equity Publishing Company (1982 ed.); 48 U.S.C. § 731b to 731e. The Puerto Rico Constitution, art. III § 5, indirectly ratifies bilingualism, stating that to be a member of the Legislative Assembly, one had to be able to read and write the Spanish or English language, 1 L.P.R.A. Const., art. III § 5.[2]

shall be made from one language to the other so that all parties interested may understand any proceedings or communications made therein.—February 21, 1902, p. 80, § 1; Const., art. I, § 1, eff. July 25, 1952.

2. § 5. [Qualifications of members of Legislative Assembly]

At the time of Kathy Smothers' graduation, the Puerto Rico Department of Education had decided to administer a centralized test for prospective teachers in both the public and private school system commencing with the 1989–1990 academic year. The test was designed to be offered only in Spanish, even for teachers of English or for teachers who would teach their courses in English within the private school system.[3] Having graduated in May 1989, Kathy Smothers took the examination in March 1990.

Plaintiff Smothers' examination was not graded because she wrote the answers to the essay portion of the test in English. She asserts that during the examination she informed the proctors that she would attempt to answer the multiple-choice questions in Spanish, but must answer the essay questions in English. She felt that because she is basically monolingual and had completed a course of studies at Interamerican University in English, she should be able to take the certification examination in English. Although Kathy Smothers was informed by the proctors that the examination had to be answered in Spanish, she nevertheless answered in English. On May 15, 1990, she was informed by the College Entrance Examination Board, which administers the test on behalf of the Department of Education, that her examination had been invalidated because she had not answered the essay portion in Spanish. Upon learning of the decision regarding her test, plaintiff wrote to the Department of Education requesting that the examination be administered in English and received no response.

Since her examination was invalidated plaintiff has been working as an elementary school teacher in a private school. Her current employer, Wesleyan Academy, has certified Kathy Smothers for the benefits of a provisional license and the Department of Education has granted such provisional status. While she has acquired a provisional license without passing the certification examination, such a license can only be renewed for a total of five years.[4]

Not being satisfied with the examination scheme provided by the Department of Education, plaintiff filed this federal suit against the officers of the Department of Education responsible for the policy of administering the teachers' certification test. Her pleading is basically a complaint pursuant to 42 U.S.C. § 1983 for violation of plaintiff's rights under the fourteenth amendment to the United States Constitution.

I.

*The Suit*

The amended complaint of March 8, 1991 contains allegations against the Department of Education, the incumbent Secretary, a former Secretary, and the Department's Licensing Director, asserting that Kathy Smothers has been willfully discriminated against by the requirement that the teachers' certification examination be taken in Spanish only. Plaintiff claims a due process violation in that she has a liberty and property interest in her right to pursue her chosen career and, once in pursuit, has an expected property interest. Plaintiff

No person shall be a member of the Legislative Assembly unless he is able to read and write the Spanish or English language and unless he is a citizen of the United States and of Puerto Rico and has resided in Puerto Rico at least two years immediately prior to the date of his election or appointment. No person shall be a member of the Senate who is not over thirty years of age, and no person shall be a member of the House of Representatives who is not over twenty-five years of age.

3. Public education in Puerto Rico is administered in Spanish. English is taught in public schools as a second language. However, there

are a large number of private schools where education is either taught in Spanish with some emphasis on English, or is primarily taught in English. Traditionally, the private school sector has employed English-speaking teachers, such as Kathy Smothers, to teach a variety of subjects, including English as such, Science, and Mathematics.

4. The record fails to reflect why such a provisional license would permit an English-speaking teacher to work in the private and public school systems for five years while such a person would not qualify to work with a regular license for failure to master written Spanish.

also asserts a violation of the equal protection clause. She seeks compensatory and punitive damages, as well as injunctive relief.

Defendants have filed two dispositive motions. In the first, a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), defendants assert that the complaint against them in their official capacity and the claim against the Department of Education is barred by eleventh amendment considerations. As to the claim against defendants in their personal capacity, it is averred that the named defendants were not personally or directly involved in any conduct that resulted in violation of plaintiff's civil rights. Defendants also claim that plaintiff has failed to exhaust administrative and judicial remedies available to her under local law. Abstention principles under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), are also invoked. Defendants have also filed a motion for summary judgment, incorporating the motion to dismiss and further claiming that defendants should be granted qualified immunity.

The court has carefully analyzed the motions and plaintiff's opposition, and now grants partial relief to defendants. First of all, we find that eleventh-amendment considerations bar the action against the Department of Education as part of the Executive branch of the government of the Commonwealth of Puerto Rico and against the officers mentioned in their official capacity. Second, we find that the officers here sued are entitled to qualified immunity as it pertains to the allegations made against them in their personal capacity. Third, we find that plaintiff need not exhaust administrative or local remedies.

Fourth, we find that the due process claim must fail. Lastly, we find that, in the posture we find this case, we are not prepared to dismiss the equal protection cause of action without discovery and trial.[5]

## II.

### Eleventh Amendment

■ In the interest of protecting states from suits by their own citizens in federal court, the eleventh amendment bars suits for damages against state governments, although it does not prevent the court from giving prospective equitable relief. *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Colón–Rivera v. Puerto Rico Dept. of Social Services*, 736 F.2d 804 (1st Cir.1984), *cert. denied*, 469 U.S. 1112, 105 S.Ct. 795, 83 L.Ed.2d 788 (1985). Therefore, plaintiff's claims for damages against the Department of Education and against the individual defendants in their official capacities are barred by the Eleventh Amendment. *See Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Plaintiff's claim for prospective equitable relief, however, is not barred. This claim would only be barred to the extent that it requires the federal court to instruct state officials to conform their conduct to state law. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). Since the basis of relief requested by the plaintiff is the fourteenth amendment of the United States Constitution, *Pennhurst* does not apply and prospective equitable relief is available. Plaintiff's claims against each of the defendants personally survive the eleventh amendment defense, although

---

5. The standard of review under Fed.R.Civ.P. 12(b)(6) and that under Fed.R.Civ.P. 56 are different. In a Rule 12(b)(6) setting, the court should grant a motion to dismiss for failure to state a claim when "it appears to a certainty that the plaintiff would be unable to recover under any set of facts." *González–Bernal v. U.S.*, 907 F.2d 246, 248 (1st Cir.1990). The court must accept as true all material allegations and construe them in favor of the complaining party. *International Paper Co. v. Jay*, 928 F.2d 480, 482 (1st Cir.1991). The summary judgment standard is fact-specific. The motion must be granted if there is no conflict of material facts. Here, we have decided to apply the Rule 12(b)(6) standard throughout. The summary judgment motion basically restates the motion to dismiss, adding only a claim of qualified immunity. That added claim has been granted pursuant to the Fed.R.Civ.P. 12(b)(6) standard. On the other hand, the surviving equal protection claim remains as both a matter of law and because obvious conflicts of fact prevail.

they may be barred by the doctrine of qualified immunity.

## III.

### Qualified Immunity

■ *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982), stands for the proposition that an official will only be considered personally liable for actions found to violate the Constitution if he "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." We find that, in the context of this case, plaintiff had no constitutional right which the officials involved "knew or reasonably should have known" about when they acted. The law concerning the equal protection standards for minority language groups is not well developed. There is no clear statutory or constitutional protection. Case law in this area is practically non-existent. The decisions involving minority language groups and equal protection on the basis of language are few and scattered throughout the circuits. These decisions do not establish a right that any official reasonably could have known existed. For that reason the defendants, in their personal capacities, are entitled to qualified immunity from plaintiff's action for damages.[6]

## IV.

### Exhaustion of Remedies

■ Defendants argue both that plaintiff has failed to exhaust administrative remedies and that she should have filed this action in local court. In a section 1983 action, the plaintiff is not required to exhaust administrative remedies. *Webb v. County Board of Education*, 471 U.S. 234,

105 S.Ct. 1923, 85 L.Ed.2d 233 (1985); *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). Nor is plaintiff required to pursue local judicial remedies unless the issue involves a state law. Since the federal remedy is intended to supplement any state remedies, the state remedies need not be exhausted before the federal remedy is requested. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Guerro v. Mulhearn*, 498 F.2d 1249 (1st Cir.1974); *Miller v. Hull*, 878 F.2d 523 (1st Cir.), *cert. denied*, 493 U.S. 976, 110 S.Ct. 501, 107 L.Ed.2d 504 (1989) ("it is firmly settled that exhaustion or resort to state remedies is *not* a prerequisite to a section 1983 claim"). Here, where the allegation is the violation of a federal constitutional standard, plaintiff may choose to proceed in either state or federal court.

■ Lastly, this file does not present any palpable comity issues and, for that reason, we do not see any validity in defendants' argument that we should abstain from exercising jurisdiction under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, as it applies to civil litigation.

## V.

### Due Process

■ Plaintiff alleges that she has a property and a liberty interest in her career and that, therefore, her status as a teacher is protected under the due process clause of the fourteenth amendment. The claim is that any action which deprives an individual of the freedom to engage in some significant area of human activity, or one which adversely affects a property interest, may violate due process.

---

**6.** We note that the regulation and the decision-making process that led to the preparation of the teacher certification examination only in Spanish was taken by then Secretary of Education Awilda Aponte Roque sometime in 1987. Subsequent Secretaries of Education José Lema Moyá and Celeste Benítez found the regulation in place and in operation. Celeste Benítez is a nominal party. She became Secretary of Education on February 1, 1991, after the facts of this case had occurred. Dalia Landrón de Pérez, the officer in charge of licensing, is also a nominal party. She has only been joined in general allegations, there being nothing in the amended complaint indicating that she was the direct perpetrator of the alleged constitutional infirmity.

While prospective employment is certainly a significant area of human activity, it has not traditionally been protected by federal due process. The Supreme Court has found that there is no fundamental right to prospective public employment, *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *Hill v. Gill,* 703 F.Supp. 1034, 1037 (D.R.I.), *aff'd,* 893 F.2d 1325 (1st Cir.1989), and no fundamental right to employment in the private sphere. *See generally, Massachusetts Board of Retirement,* 427 U.S. at 319, 96 S.Ct. at 2569 (Marshall, J., dissenting).

The Supreme Court has found a property interest in government employment, but this only attaches after the person has already attained the position. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *see also Beitzell v. Jeffrey,* 643 F.2d 870 (1st Cir.1981). The Court has also found a liberty interest in retaining a professional license, but again the license must first have been obtained. *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979). Plaintiff's situation, an inability to meet the qualifying criteria for prospective employment as a teacher, is not protected by the fourteenth amendment under the rubric of fundamental rights. Therefore, plaintiff's due process claim must fail. Only if she, as a member of a certain group, has been singled out for unequal treatment, does the fourteenth amendment step in to offer her any protection.

## VI.

### Equal Protection

The discussion that follows is intended to give perspective to both sides of this controversy on the surviving issue of equal protection which will be tried on the merits. The difficulty is obvious. The few available court decisions and law review articles on the subject have as their basic premise a setting in the Continental United States or a stateside society whose predominant public language is English. Puerto Rico, a part of the United States and a traditionally officially bilingual jurisdiction for eighty-nine of the ninety-four years of U.S. history here, poses another problem. While a language dispute like the one at bar in a California or Massachusetts setting originates in a primarily English-speaking society, the dispute as presented here originates in a bilingual or predominantly Spanish-speaking context.

The controversy presented here may either be that of resident citizens who speak predominantly English in this society, where the majority speaks predominantly Spanish or is bilingual, or it may be that of those resident citizens who otherwise qualify to be members of a profession but, because of a lack of familiarity with written Spanish, must answer the essay questions of a licensing examination in English. In equal protection terms, the affected plaintiff can present a justiciable equal protection claim under one of three standards: strict scrutiny, which is triggered when suspect classifications, such as race, religion or national origin are involved; heightened scrutiny, if language minorities can be termed a quasi-suspect class, as in the case of gender-based legislation; or the rational basis standard, used when a law serves to render any other type of classification.

The fourteenth amendment, through the equal protection clause, requires that similar groups be treated in a similar fashion. *City of Cleburne, Texas v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920). It also prevents "things which are different in fact or opinion [from being] treated in law as though they were the same." *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). It is designed to prevent the government from creating classifications which treat similar groups differently or different groups similarly. However, in a system where some degree of classification is a functional necessity, certain distinctions, or the absence of distinctions, must be allowable. For this reason, the equal protection clause has only been employed when "dis-

crete and insular" groups are threatened, *United States v. Carolene Products Co.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 784 n. 4, 82 L.Ed. 1234 (1938), because those are particularly in need of "extraordinary protection from the majoritarian political process."

The difficulty in treating plaintiff's equal protection claim lies in the fact that language use by minority language groups has not yet been situated within the framework of legal standards which control the application of the equal protection clause of the fourteenth amendment. That minority language groups are vulnerable to majoritarian politics is clear, *see* A. Califa, *Declaring English the Official Language: Prejudice Spoken Here,* 24 Harv.C.R.–C.L.L.Rev. 293 (1989); what is not yet clear is how best to protect them. Establishing a balance between the need to protect potentially-vulnerable language groups and the need to ensure the smooth functioning of government is a challenge that faces countries and other entities containing more than one language group within their respective borders.[7]

### A. Language and National Origin—Strict Scrutiny Standard

The Supreme Court has explicitly endorsed a two-tiered system of review for cases alleging equal protection violations. The standard analysis is that a provision "does not deny equal protection of the laws so long as it can be said to be rationally related to a legitimate governmental purpose." *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Pearson v. Fair,* 935 F.2d 401 (1st Cir. 1991); *Doe v. Gaughan,* 808 F.2d 871, 881 (1st Cir.1986). If, however, a law singles out a group that represents a "suspect" classification, such as race, religion or national origin, *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (religion); *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (race); *Oyama v. California,* 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948) (ancestry); or attacks a fundamental right, *City of Cleburne, Texas v. Cleburne Living Center, Inc.,* 473 U.S. at 440, 105 S.Ct. at 3254; *Le Clair v. Saunders,* 627 F.2d 606, 611 (2nd Cir.1980); the law is subject to strict scrutiny by the court. This means that the legislative classification must be based upon a compelling government interest. *See San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 16–17, 93 S.Ct. 1278, 1287, 36 L.Ed.2d 16 (1973). This system balances the protection of those groups historically most vulnerable to the prejudices of the majority with the need to ensure the smooth functioning of government.

Language is becoming an increasingly important issue in the public discussion of the multiplicity of American society. Although our history has frequently been punctuated by debate concerning the treatment of language minorities, *see* Note, *"Official English": Federal Limits on Efforts to Curtail Bilingual Services in the States,* 100 Harv.L.R. 1345, 1348 (1987), american society remained unconscious of the role language plays in the life of the individual. More recently, with the increased understanding of the necessity of cultural tolerance, the courts and Congress have been careful to protect the more populous language minorities from the majority.[8] Now, with a growing number of laws,

---

7. *See* Califa, 24 Harv.C.R.–C.L.L.Rev. at 322. The author suggests that using language as a way of asserting the dominance of one language group over another creates rather than eases tension.

8. *E.g.,* 42 U.S.C. § 2000d (1982) (prohibiting discrimination based on national origin in programs receiving federal financial assistance); 42 U.S.C. §§ 1971–1974 (1982) (extended coverage of the Voting Rights Act of 1965 to include language minorities); 20 U.S.C. §§ 3281–3341 (1988) (provided financial assistance to local programs designed to assist children and adults whose first language is not English); 28 U.S.C. § 1827(d) (1982) (requires use of interpreters in courtroom); 42 U.S.C. § 254b(f)(3)(J) (1982) (use of foreign languages in federally-funded migrant and community health centers); 42 U.S.C. § 4577(b)(3) (1982) (use of foreign languages at federally-funded alcohol abuse centers). Many of these laws were built upon court decisions recognizing the rights of language minorities in important areas like voting, education, and access to social services.

regulations, and policies which privilege one language over the others, the immediacy of the conflict between language groups grows in importance in both the public and private spheres.[9] While courts have generally avoided any direct analysis of language within the framework of equal protection, in those cases where they have had to classify language discrimination they have acknowledged it can be an aspect of discrimination on the basis of national origin. The identification of language ability with national origin may be an appropriate tool for the protection of language minorities.

Any language can be identified as an essential characteristic of a particular national group. For a characteristic to be considered synonymous with any group in the equal protection context, it must be immutable. *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973). While language can be considered a mutable characteristic,[10] it has immutable aspects. New languages can be learned and old ones forgotten; however, the knowledge of a language, insofar as it is an ethnic characteristic, leaves identifiable traces like accents, surnames, and behavior patterns. *Olagues v. Russoniello*, 797 F.2d 1511, 1520–21 (9th Cir.1986), *cert. granted*, 481 U.S. 1012, 107 S.Ct. 1885, 95 L.Ed.2d 493 *later proceedings*, 484 U.S.

806, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987), *vacated as moot*, 832 F.2d 131 (9th Cir. 1987) ("Just as persons of different ethnic groups are distinguished by surnames … persons of different nationalities are often distinguished by a foreign language."). Where these traces are used to discriminate against a certain group, language becomes an indicia of national origin. Discrimination against a group because of linguistic characteristics which identify them as being of a certain national origin should be examined in the most careful possible manner.

While the Supreme Court has not yet directly addressed the issue of classification on the basis of language group, it has touched on the problem of language. It has ruled that language group establishes a protected group for equal protection purposes in the area of peremptory jury challenges. *Hernández v. New York*, —— U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).[11] There, the Court said that although it would not reach the question of whether Spanish-speaking ability bears such a close relation to ethnicity, using that ability as a ground for a peremptory challenge could violate equal protection. The Court said that "[i]t may well be, for certain ethnic groups and in some communities, that proficiency in a particular lan-

---

**9.** Since this case was filed the Legislature of Puerto Rico has passed a statute which establishes Spanish as the official language of Puerto Rico. Act No. 4, of April 5, 1991. This parallels the passage of so-called English-only laws in several states: Alabama, Arizona, Arkansas, California, Colorado, Florida, Illinois, Indiana, Mississippi, Nebraska, North Carolina, North Dakota, South Carolina, and Virginia. Many feel that the rise of English-only laws correlates with the rise of prejudice against Spanish speakers, A. Califa, *Declaring English the Official Language: Prejudice Spoken Here*, 24 Harv.C.R.–C.L.L.Rev. 293 (1989). Similarly, the passage of the Spanish-only law has been correlated by local public opinion with anti-Americanism.

**10.** According to many English-only proponents, languages can be learned, which places the burden on the monolingual individual. For some individuals, however, language is not a mutable characteristic. *See* Califa, *Declaring English the Official Language: Prejudice Spoken Here*, 24 Harv.C.R.–C.L.L.Rev. 293, 335 n. 262 (1989). In

the above article, the author cites a study which suggested that for immigrants above a certain age language was immutable because they were incapable of learning a new language. The author goes on to suggest that language should be treated as a suspect class in the way that alienage is treated as a suspect class. Alienage is not immutable because aliens can become citizens, but presumably the barriers to citizenship are considerable. Similarly, the difficulty of learning a new language makes speakers of the non-majority language a vulnerable group during the period of their transition to majority language speakers.

**11.** The Court found that a prosecutor's peremptory challenge of bilingual jurors where those jurors indicated by their behavior that they could not rely solely upon the translator's translation did not establish an equal protection problem without proof of an intent to discriminate beyond the fact that such a peremptory challenge would have a disparate impact on Latino jurors.

guage, like skin color, should be treated as a surrogate for race under an equal protection analysis." *Id.* at ——, 111 S.Ct. at 1873.

■ Certain Ninth Circuit opinions with persuasive value have explicitly found that classification on the basis - of language group can be equivalent to classification on the basis of national origin, *Olagues v. Russoniello*, 797 F.2d 1511, 1520–21 (9th Cir.1986), *cert. granted*, 481 U.S. 1012, 107 S.Ct. 1885, 95 L.Ed.2d 493 *later proceedings*, 484 U.S. 806, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987), *vacated as moot*, 832 F.2d 131 (9th Cir.1987); *Gutiérrez v. Municipal Court of Southeast Judicial Dist.*, 838 F.2d 1031 (9th Cir.1988), *vacated as moot*, 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989).[12] In *Olagues*, the screening of the ballots of recently registered voters to check for citizenship status using bilingual ballots and foreign birth as criteria was found by the Ninth Circuit to be discrimination on the basis of national origin. The court distinguished two older cases, *Frontera v. Sindell*, 522 F.2d 1215 (6th Cir.

1975),[13] and *Soberal–Pérez v. Heckler*, 717 F.2d 36 (2nd Cir.1983), *cert. denied*, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984),[14] because "while a non-English-speaking classification is facially neutral with respect to ethnic group classification, the classification challenged here is not, because *for all practical purposes* it is a classification based on race and national origin." *Olagues v. Russoniello*, 797 F.2d at 1521 (emphasis added). The court made an initial determination that in such case, classification on the basis of language is equivalent to classification on the basis of national origin.

In a later case with persuasive value, *Gutiérrez v. Municipal Court of Southeast Judicial Dist.*, 838 F.2d 1031 (9th Cir. 1988), *vacated as moot*, 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989), the Ninth Circuit went on to find that a rule that employees could only speak English in the work place, except when they were serving Spanish-speaking clients, was discrimination on the basis of national origin.[15] While the *Gutiérrez* case involved

**12.** While a decision which has been vacated as moot has no precedential value, *County of Los Angeles v. Davis*, 440 U.S. 625, 634 n. 6, 99 S.Ct. 1379, 1384–85 n. 6, 59 L.Ed.2d 642 (1970); *see also* 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3533.10 at 442–43 and n. 47 (2d ed. 1984 Supp.1992), the reasoning remains persuasive.

**13.** The *Frontera* court found that plaintiff, a carpenter, did not have a right to take a civil service exam in Spanish. The court applied the rational relation test to the policy of the City of Cleveland, finding that this was not an appropriate case in which to subject state action to strict judicial scrutiny. The court's language indicates that it privileged the interest of the state government in conducting its business in English. While this should certainly be a concern, there is nothing in the opinion to suggest that the court balanced this interest against the plaintiff's interest in not being subject to discrimination.

**14.** The Second Circuit found that the failure of the Department of Social Services to provide forms and services in Spanish did not violate the equal protection clause. The court found that a law which distinguishes on the basis of language, for example, differentiating between English-speaking and non-English speaking individuals, was not making a distinction on the basis of race, religion or national origin. The

court felt that "[l]anguage, by itself, does not identify members of a suspect class." *Id.* at 41.

**15.** It should be noted that the Fifth Circuit has ruled the other way on exactly this issue. *Garcia v. Gloor*, 618 F.2d 264, 270 (5th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). In this case, the court differentiated between true bilinguals and functional monolinguals. It said: "National origin must not be confused with ethnic or sociocultural traits or an unrelated status, such as citizenship or alienage ... or poverty ... 'or with activities not connected with national origin like labor agitation." *Id.* at 269. But even this court found that language could be an indicia of national origin: "To a person who speaks only one tongue or to a person who has difficulty using another language. than the one spoken in his home, language might well be an immutable characteristic like skin color, sex or place of birth." *Id.* at 270. It went on to say: "Differences in language and other cultural attributes may not be used as a fulcrum for discrimination. However, the English-only rule, as applied by Gloor to Mr. Garcia, did not forbid cultural expression to persons for whom compliance with it might impose hardship." *Id.* The court was not willing to establish a right to use one's first language. The plaintiff in that case was fluent in both languages and objected to his employer's rule that only English be spo-

Title VII, 42 U.S.C. § 2000e, *et seq.*, that statute contains language similar to that of the jurisprudence surrounding equal protection, prohibiting discrimination on the basis of race, color, religion, sex or national origin. 42 U.S.C. § 2000e–2. The court found that "[b]ecause language and accents are identifying characteristics, rules which have a negative effect on bilinguals, individuals with accents, or non-English speakers, may be mere pretexts for intentional national origin discrimination." *Gutiérrez*, 838 F.2d at 1039.

The Ninth Circuit, in *Olagues*, made a useful distinction between rules which just involve general classifications between English-speaking and non-English speaking individuals and rules which use language as a means of isolating a particular group. The court suggested that it is clear that the latter situation would fall into the strict scrutiny tier of equal protection analysis. However, as noted above, equal protection also extends to those situations where "things which are different in fact or opinion ... [are] treated in law as though they were the same." *Plyler*, 457 U.S. at 216, 102 S.Ct. at 2394. While *Olagues* suggested that only laws which single out a particular language group merit strict scrutiny, *Gutiérrez* might be seen as suggesting something more. There, the court objected to a rule which required all employees to speak English except when their job required them to speak Spanish. In that case, the rule did not single out a particular language group, although it was clearly directed against the Spanish speakers. Rules or laws which require all employees to speak Spanish or English would allow one group to speak their first language in their private conversations while forbidding the other group from doing so, on the basis of national origin.[16]

We do not have the facts developed sufficiently before us to enable a finding of discrimination based upon national origin in the instant case. The motivation behind the Spanish-only requirement and its impact will have to be more fully developed during discovery and trial.

**B. Language minorities and heightened scrutiny**

Unless the law in question can be identified with national origin as outlined above, strict scrutiny is inappropriate to apply to situations involving language minorities. However, there are cases where laws might impact upon important rights of language minorities, yet not be identifiable as discrimination on the basis of national origin. These laws might create serious equal protection problems, yet not threaten a suspect class or fundamental right. As seen above, the Ninth Circuit will only find a fairly narrow set of laws, laws which are facially discriminatory, to be discrimination on the basis of national origin. However, should laws arise which threaten rights like the access to social services, or education, or employment, or voting, which are not fundamental rights, yet are important to the existence of a group in society, there should be a mechanism for examining those laws other than the dull instrument of the rational relation test. The traditional rational relation test may not adequately balance the interests involved where the majority language group burdens minority language groups. Any law which uses language as the basis for classification should be closely examined to see whether its effect is unduly burdensome to any particular language group for impermissible reasons.[17]

ken during work. This is distinguishable from a situation where the individual affected is monolingual.

**16.** There has been a fair amount of case law developed in the area of English-only rules in the workplace. J. Perea, *English–Only Rules and the Right to Speak One's Primary Language in the Workplace,* 23 U.Mich.J.L.Ref. 265 (1990). While a blanket English-only rule is considered by the EEOC to be a per se violation of Title VII,

a limited English-only rule may be justified by business necessity. 29 C.F.R. § 1606.7(a)–(c) (1989).

**17.** "A policy of monolingualism does not explicitly 'classify' persons: all are given 'equal' services (in English), and no distinctions are overtly drawn between individuals. Yet the adverse effects of this 'equal' treatment falls disproportionately on language minorities." Note, *Official English,* 100 Harv.L.R. at 1357.

An intermediate level of scrutiny has developed as a result of the relative rigidity of the two-tier system equal protection standard composed of strict scrutiny and rational basis. Since the Supreme Court has seemed unwilling to expand the categories of fundamental rights and suspect classes that would be protected by strict scrutiny, *Massachusetts Board of Retirement v. Murgia*, 427 U.S. at 319–20, 96 S.Ct. at 2569 (J. Marshall, dissenting),[18] opinions have issued which hint at, without explicitly creating, an additional level of review. The most clearly identifiable intermediate test is the protection afforded quasi-suspect classifications, like those of gender and illegitimacy. The Supreme Court applies a heightened level of scrutiny to these classifications. *Mississippi University for Women v. Hogan*, 458 U.S. 718, 723–24, 102 S.Ct. 3331, 3335–36, 73 L.Ed.2d 1090 (1982); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). The court has also raised the level of scrutiny if the challenged classification embodies a collection of "unique circumstances." *Montalvo–Huertas v. Rivera–Cruz*, 885 F.2d 971, 977 (1st Cir.1989) (quoting *Plyler*, 457 U.S. at 239, 102 S.Ct. at 2406 (Powell, J., concurring)).[19] The intermediate level of scrutiny has not officially joined the traditional standards, but it has expanded the purview of a court to apply heightened scrutiny to certain cases. Intermediate scrutiny is "a judicial response to statutes creating distinctions among [groups] ... based on factors the Court evidently regards as in some sense 'suspect' but appears unwilling basis test in cases ... which do not involve quasi-suspect classifications or important personal rights."

Plaintiff, as a member of a minority language group in the context of Puerto Rico, is vulnerable to the vagaries of majoritarian politics. The limitation of her choices because of her monolingualism, in what is functionally a bilingual society, may constitute an arbitrary discrimination. The use of one's language is an important aspect of one's ethnicity, and should not be sacrificed to government or business interests without good cause.

While employment, as discussed above, is not a fundamental right, it is essential to succeeding and gaining respect in society. "In so far as a man is deprived of the right to labor, his liberty is restricted, his capacity to earn wages and acquire property is lessened, and he is denied the protection which the law affords those who are permitted to work." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. at 322, 96 S.Ct. at 2571 (Marshall, J., dissenting) (quoting *Smith v. Texas*, 233 U.S. 630, 34 S.Ct. 681, 58 L.Ed. 1129 (1914). However, plaintiff is not being denied the right to employment. She is being denied the right to pursue the career for which she has educated herself. Undoubtedly, she will still be able to find employment in another sector of society. The right to pursue a career does not rise to the level of the right to employment. Nevertheless, plaintiff's particular situation may only raise the question of whether the requirement of administering the teacher's certification examination in Spanish is rationally related to a legitimate government interest. Because of the particular vulnerability of language minorities, we feel that we should look carefully at the motivations of the Department of Education if we are to apply the

---

**18.** The gap between strict scrutiny, which was generally fatal to the statute, and rational relation, which is usually benign, was also too large to be very effective. L. Tribe, *American Constitutional Law*, § 16.6 (1988).

**19.** In *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), the Supreme Court decided to subject a law which prevented the children of undocumented aliens from attending school. While undocumented aliens could not be a suspect class because their presence in the United States violated federal law and education was

not a fundamental right, the Court found that children of undocumented aliens were such a vulnerable group and education so important, both to them and society, that "we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in § 21.013 can hardly be considered rational unless it furthers some *substantial* goal of the State." *Id.* at 224, 102 S.Ct. at 2398.

rational relation test as it is articulated in *City of Cleburne.*

## VII.

### *Future Course of Action*

The discussion of the three equal protection possibilities in a case such as this should not be taken as meaning that the court has already decided which standard to apply. The motion for summary judgment, as it relates to the equal protection cause of action, must be denied. We read in between the lines of the poorly-drafted motion and opposition and supporting documents enough conflict of material facts of the kind that prevent a Fed.R.Civ.P. 56 determination. Specifically, we do not yet know whether the Spanish-only requirement has operated to discriminate on the basis of national origin, or has so disadvantaged a language minority as to be worthy of heightened scrutiny. Finally, we have not been presented with enough evidence to determine whether the licensing requirement can be termed rational, especially in the context of public and private schooling in Puerto Rico.

Constitutional litigation requires precision in pleading-drafting and motion practice. The filings by both parties in this case are not conducive to an adequate review of the important issues that for both sides this file presents. We only expect that the parties will fine tune their presentations and that for the purposes of the pending discovery, pretrial, and trial stages, the court is presented with postures worthy of the important and challenging legal controversies presented in this case.

We now ORDER that discovery be conducted by traditional discovery means within the next ninety (90) days. The parties are encouraged to cover such areas as they see fit, touching upon the motivations on the part of the Department of Education for adopting the present licensing policy as it relates to the public school system and the private school system, as well as the impact of the policy upon those who have not mastered written Spanish. While the public schools of Puerto Rico are conducted exclusively in Spanish, with English as a second language course, there are many private schools where instruction is conducted almost exclusively in English. The parties must be prepared to fully address all the implications of the reality in the context of the present licensing requirements.

A Pretrial Conference shall be held on September 30, 1992, at 5:00 P.M. Trial shall commence on October 13, 1992, at 9:00 A.M. As this case now stands, if plaintiff prevails she will only be entitled to injunctive relief. Since the plaintiff has invoked the right to trial by jury, the parties will address the availability of such right in the context of what remains of this action. A concise argument on this point will be made as part of the proposed pretrial order.

## VIII.

### *Conclusion*

Defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss and their Fed.R.Civ.P. 56 motion for summary judgment are GRANTED as they relate to eleventh amendment immunity, qualified immunity, and the due process claim. The motions are DENIED as they require plaintiff to exhaust administrative and local remedies. The motions are DENIED as they relate to the equal protection claim and potential injunctive relief.

IT IS SO ORDERED.

### ORDER

Further to the Opinion and Order of May 13, 1992, the court approves the settlement reached by the parties. The defendants will issue a permanent teacher's license to plaintiff Kathy Smothers within thirty (30) calendar days from the date of entry of this order. Such license will allow the plaintiff to practice the teaching profession in the Commonwealth of Puerto Rico without classification on the basis of a given language group.

Attorney's fees have been imposed. *See* Order dated November 13, 1992.

IT IS SO ORDERED.