### Jesus MARTI NAVARRO, Plaintiff,

v.

### UNITED STATES of America, et al., Defendants.

### No. Civ. 96–1653(HL).

United States District Court, D. Puerto Rico.

June 14, 2000.

Demetrio Fernandez–Quinones, San Juan, PR, for plaintiff.

Fidel A. Sevillano–Del–Rio, U.S. Attorney's Office District of P.R., Civil Division, Hato Rey, PR, for USA, defendants.

### OPINION AND ORDER

LAFFITTE, Chief Judge.

This litigation arises out of Plaintiff Jesús Martí Navarro's ("Martí") termination from his job as a Special Agent with the Federal Bureau of Investigation ("FBI"). Martí alleges that his termination was in violation of several provisions of federal law. Although Martí's complaint attempts to set forth seven separate causes of action, Martí in fact sets forth only four distinct claims.

First, Martí asserts that his firing constitutes a deprivation of property without due process of law. See U.S. Const. Amend. V. Second, Martí argues that Defendants deprived him of liberty without due process of law. See *Id.* Third, Martí claims that Defendants abridged his right to equal protection of the laws under the equal protection component of the Fifth Amendment's Due Process Clause. See *Id.; Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (holding that "the concepts of equal protection and due process ... are not mutually exclusive.... [D]iscrimination may be so unjustifiable as to be violative of due process."); 3 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 18.1 (3rd ed.1999) (stating that "classifications established by federal law are reviewed under the implied equal protection guarantee of the Fifth Amendment due process clause"). The Court treats these claims for constitutional violations as claims under *Bivens v. Six Unknown Federal Narcotic Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Fourth, Martí brings a claim of discrimination on the basis of race and national origin under Title VII of the Civil Rights Act of 1964. 42 U.S.C.A. § 2000e et seq. (West 1994).

Before the Court are Defendant's Motion to Dismiss, Dkt. No. 9, Plaintiff's Opposition, Dkt. No. 14, Defendant's Reply, Dkt. No. 27, and Plaintiff's Sur-reply, Dkt. No. 30. Further, Defendant has filed a separate Motion to Dismiss Plaintiff's Amended Complaint, Dkt. No. 20, and Plaintiff has submitted an Opposition, Dkt. No. 23.

For reasons to follow, the Court hereby grants Defendants' Motion to Dismiss Martí's claim of deprivation of property without due process of law, his claim of deprivation of liberty without due process of law, his equal protection claim, and his Title VII claim. Accordingly, all of Martí's claims are hereby dismissed with prejudice.

## Statement of Facts

The pertinent facts of this case are as follows. On July 28, 1986, Martí became a Special Agent with the FBI. In October of 1989, Martí was transferred from Newark, New Jersey to San Juan, Puerto Rico. The events that give rise to this case occurred while Martí was assigned as a Special Agent on an investigation to which the FBI referred as "Broomstick." As part of this investigation, in 1991, Martí on behalf of the FBI gave a $2,500.00 security deposit for electricity to the owner of a property that the FBI was leasing for use in its covert operations.

Skipping past events that have no bearing on this case, in 1993, after the FBI no longer needed to use the leased property, Martí returned to the owner of the property to collect the FBI's $2,500.00 security deposit. The owner of the property made out a check to Martí himself for $2,500.00. Upon receipt of this check, Martí substituted $2500.00 in cash of his own money for the check, and went to the FBI office to give the cash to the FBI. Martí deposited the check into his personal checking account.

When Martí attempted to give the money to Special Agent Allan Gómez ("SA Gómez") at the FBI office, Martí was told to hold onto the money for a while. Martí did this, eventually storing the money in a briefcase in a closet in his home. After suffering a severe head injury in a hit-and-run collision, Martí was approached by SA Gómez regarding the funds on October 12, 1993. Martí, at that time, was confused and stated that he had turned the money into the FBI office. The next day, Martí told SA Gómez that the money was in his home. The day after that, Martí returned the money to the FBI.

Eventually, an investigation by the FBI of the events surrounding the handling of the security deposit funds resulted in Special Agent in Charge Robert J. Opfer ("SAC Opfer") issuing to Martí a formal letter of censure on April 22, 1994. In April of 1994, SAC Opfer also named Martí acting Principal Legal Advisor of the FBI's San Juan division, a position that he occupied until his dismissal. On November 16, 1994, newly-arrived Special Agent in Charge Richard D. Schwein ("SAC Schwein") delivered to Martí a letter from FBI Headquarters dated November 10, 1994 and advising Martí that the FBI was considering dismissing him. Then, on March 6, 1995, Martí received a letter from FBI Headquarters dated February 27, 1995 dismissing Martí from the FBI for conversion of FBI funds. Martí filed a request for reconsideration on April 4, 1995. His request was denied on August 30, 1995, and he received the denial on September 9, 1995. On May 24, 1996, Martí filed this lawsuit.

## Discussion

Defendants have filed a Motion to Dismiss Martí's claims under several provisions of Fed.R.Civ.P. 12(b). The Court shall treat the Motion to Dismiss as having been brought pursuant to Rule 12(b)(6). In ruling on a Rule 12(b)(6) motion to dismiss, a court must accept all well-pled factual averments as true and must draw all reasonable inferences in the plaintiff's favor. *Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Assn.*, 37 F.3d 12, 14 (1st Cir.1994). A court should not dismiss a complaint for failure to state a claim unless it is clear that the plaintiff will be unable to prove any set of facts which would entitle him to recovery. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44 (1st Cir. 1991). In his complaint a plaintiff is obliged to allege facts regarding each essential element necessary to entitle him to recovery under an actionable legal theory. *Roth v. United States*, 952 F.2d 611, 613 (1st Cir.1991) (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988)).

Martí's first claim is that he was deprived of property without due process of law. While the parties agree that an FBI Special Agent normally has no expec-

tation of continued employment,[1] Martí argues that the letter of censure issued to him by the FBI vested him with a property interest in continued employment with the FBI.[2] According to Martí, the FBI's issuance of the letter of censure effectively barred the FBI from imposing further discipline on Martí for any events arising from the handling of the $2,500.00 security deposit. Thus, Martí argues that he had a legitimate expectation that his employment would not be terminated for reasons relating to the security deposit incident.

Even if Martí has alleged facts adequate to support his contention that he had a legitimate expectation of continued employment with the FBI, he has not alleged facts sufficient to show that he was deprived of a property interest *without due process of law*. It is not enough merely to demonstrate that one's property was taken; one must show that one suffered a deprivation without due process of law.

It is well established that "[d]ue process normally requires notice and opportunity for 'some kind of hearing.'" *Herwins v. City of Revere*, 163 F.3d 15, 18 (1st Cir. 1998) (quoting *Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 19, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978)), *cert. denied*, 119 S.Ct. 1497 (1999). Further, "[w]here feasible, the opportunity (for obvious reasons) is expected to be pre-deprivation...." *Id.* When one is deprived of a property interest because of the "random and unauthorized" acts of government actors, however, feasibility dictates that "the due process inquiry is limited to the issue of the adequacy of postdeprivation reme-

dies...." *Lowe v. Scott*, 959 F.2d 323, 340 (1st Cir.1992).

In this case, Martí's dismissal is not the result of random and unauthorized acts by any government actor. The Supreme Court has defined random and unauthorized acts as those that are "not the result of some established [government] procedure and the [government] cannot predict precisely when the [act] will occur." *Parratt v. Taylor*, 451 U.S. 527, 541, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). A random and unauthorized act "is in almost all cases beyond the control of the [government]." *Id.*

On the contrary, Martí's termination is the result of carefully considered government action. Thus, the Court must examine the adequacy of the FBI's pre-termination procedures. This examination requires a consideration of whether these procedures provide for notice and an opportunity to be heard "in a meaningful manner." *Parratt*, 451 U.S. at 540, 101 S.Ct. 1908.

In his Amended Complaint, Dkt. No. 18, Martí attacks the adequacy of the FBI's pretermination procedures. Martí alleges that he was not properly presented with the evidence against him, including the names and sworn statements of the witnesses against him, and that he was not given a "pretermination hearing." Dkt. No. 18. Martí's own submissions, however, establish the adequacy of the FBI's pretermination procedures.[3]

---

1. The position of FBI Special Agent is specifically exempted from the reach of the civil service laws, so that FBI Special Agents have no expectation of continued employment and no due process property rights in their positions. See *Mack v. United States*, 814 F.2d 120, 123 (2nd Cir.1987).

2. The Supreme Court has held that "[p]roperty interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....'" *Cleveland Bd. of*

*Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Under some circumstances, a government employer can create an "understanding" that binds the government employer and creates a property interest in continued employment. *Perry v. Sindermann*, 408 U.S. 593, 599–600, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

3. Although the Motion to Dismiss in this case is based on Rule 12(b)(6), the Court may under certain circumstances consider docu-

Martí submits a copy of the letter informing him that the FBI was considering his dismissal. Dkt. No. 23, Exhibit 4. In that letter, A.B. Llewellyn ("Llewellyn"), Unit Chief in the Administrative Summary Unit of the FBI, sets forth in careful detail his conclusions of fact, the evidence upon which his conclusions are based, and his reasoning for considering Martí's dismissal. Further, at the end of the letter, Llewellyn states, "[y]ou have ten calendar days following your receipt of this letter to provide a written reply to my proposal.... Full and careful consideration will be given to any response which you submit to this notice before a final decision is rendered." *Id.*

Martí alleges that he filed a reply to the letter proposing dismissal in which he set forth the reasons for his disagreement with the FBI's pending employment decision. Martí then alleges that he received on March 6, 1995 a letter of dismissal signed by Edward R. Leary, of the Personnel Management Section of the FBI's Personnel Division. In that letter, Martí was again presented with the evidence against him and with counter-arguments to those presented in Martí's reply. Finally, the letter informed Martí of his ability to request an "agency reconsideration" of his dismissal. Dkt. No. 23, Exhibit 5.

Martí alleges that after filing a letter requesting reconsideration of his termination, he received on September 9, 1995 a letter denying his request. In that letter, Martí was again informed of the evidence against him, the reasoning used by the FBI, and the counter-arguments to those

mentary evidence. The First Circuit has held that "[w]hen, as now, a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir.1998).

presented in Martí's request for reconsideration. Dkt. No. 23, Exhibit 6.

In spite of the specificity of the FBI's notices to Martí before his dismissal (leaving aside the post-dismissal letter), Martí still claims that the FBI's pre-deprivation procedures are inadequate to satisfy the minimum requirements of due process. This argument simply does not stand up. Martí clearly had notice and an opportunity to be heard. He filed submissions in which he took full advantage of his opportunity to be heard. Finally, the FBI's responses demonstrate that the FBI carefully considered Martí's arguments. The FBI's procedures certainly meet the requirements of due process, and the FBI complied with those procedures.[4]

Martí further argues that the FBI's post-deprivation procedures are insufficient to meet the demands of due process. In light of the adequacy of the FBI's pre-deprivation procedures, however, the Court shall not examine the FBI's post-deprivation procedures. Thus, Martí's claim that he was deprived of property without due process of law can not survive.

■ Martí's second claim, that he was deprived of liberty without due process of law, is based on his contention that he was entitled to a name-clearing hearing to refute the reasons given by the FBI for his dismissal. According to Martí, his termination damaged his reputation in the community and prevented him from finding other employment. He further alleges that the FBI disseminated information about the reasons for his dismissal.

Martí alleges that after his termination from the FBI, he attempted to procure

4. Martí alleges that the FBI's internal rules require that the subject of personnel action be informed of the names of the witnesses against him. Martí was not told that SA Gómez' testimony influenced Martí's dismissal until he received the letter denying his request for reconsideration. Even if this set of facts sets forth a violation of the FBI's own procedures, the Court does not consider this to rise to the level of a violation of due process.

employment with the Federal Emergency Management Agency ("FEMA"). Two months after being hired, Martí claims, he was terminated. Martí alleges that he was terminated because of information given to FEMA by the FBI regarding his dismissal from the FBI. Martí's specific allegation is that Assistant Special Agent in Charge Héctor Pesquera ("ASAC Pesquera") of the FBI conveyed the information surrounding Martí's dismissal from the FBI to the United States Attorney's Office for the District of Puerto Rico. The United States Attorney, in turn, conveyed this information to FEMA.

Unfortunately for Martí, he has alleged no facts that suggest that the FBI disseminated information about his dismissal in a way that implicates Martí's liberty interest under the due process clause. For a dissemination of such information to implicate one's liberty interest, it must happen "in a formal setting (and not merely as the result of unauthorized 'leaks'), and thereby significantly have interfered with the employee's ability to find future employment." *Silva v. Worden*, 130 F.3d 26, 33 (1st Cir.1997) (citing *Beitzell v. Jeffrey*, 643 F.2d 870, 879 (1st Cir.1981)). See also, *Lopez–Pacheco v. United States*, 627 F.Supp. 1224 (D.P.R.1986) (deciding that plaintiff failed to state a claim of invasion of privacy under the Puerto Rico Constitution and thus failed to state a claim under the Federal Torts Claim Act because information about plaintiff was only disseminated "to a few federal agencies," so that publication was not "sufficiently diffuse"), *aff'd*, 815 F.2d 692 (1st Cir.1987). Martí's allegations do not constitute the kind of formal dissemination that is required to make out a claim of a deprivation of one's liberty. Accordingly, this claim fails.

Martí's third claim is that he was denied the equal protection of the laws under the Fifth Amendment due process clause.

Martí sets forth this claim in the following terms:

> By actually discharging plaintiff from his position defendants acted in an unreasonable, arbitrary and capricious manner and have, thereby, deprived plaintiff of equal protection of the laws guaranteed under the fifth amendment to the United States Constitution.

■ Martí fails, however, to articulate an equal protection claim. The guarantee of equal protection of the laws operates as a limit on "the government's ability to classify persons or 'draw lines' in the creation and application of laws." 3 Treatise on Constitutional Law § 18.2. In other words, "[e]qual protection is the guarantee that similar people will be dealt with in a similar manner and that people of different circumstances will not be treated as if they were the same." *Id.* (citing Joseph Tussman & Jacobus tenBroek, The Equal Protection of the Laws, 37 Calif.L.Rev. 341 (1949)). Martí's claim has nothing to do with government line-drawing or classifications. He simply claims that he was arbitrarily terminated. The Supreme Court of the United States has consistently made clear that " '[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' " *Village of Willowbrook v. Olech*, —— U.S. ——, —— – ——, 120 S.Ct. 1073, 1074–75, 145 L.Ed.2d 1060 (2000) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (1923)).[5] See also *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 43 (1st Cir.1992) (stating that the plaintiff "points to no allegations of fact in the complaint, nor to anything in the record, bearing out the conclusory assertion that

5. Although the cited case refers to the equal protection guarantee set forth in the Fourteenth Amendment, for equal protection pur-

poses "[f]ederal laws are ... tested under the same standards as state laws...." 3 Treatise on Constitutional Law § 18.1.

others similarly situated were treated differently from himself. It follows that there can be no equal protection violation."). Martí's equal protection claim thus can not survive.

Martí's fourth claim asseverates that he was discriminated against in violation of Title VII. Defendants move to dismiss this claim on the ground of failure to exhaust administrative remedies. Defendants argue that Martí failed to consult an EEOC counselor within 45 days of the alleged discrimination that he suffered. See 29 C.F.R. § 1614.105 (1999). Defendants do not argue that Martí failed to consult an EEOC counselor. Rather, they assert that Martí sought counseling too late. Thus, the Court shall treat Defendants' motion as based on timeliness, rather than outright failure to exhaust.

The parties agree that Martí first sought EEOC counseling on October 23, 1995. The parties' disagreement concerns at what point the 45–day clock started running. According to Martí, the 45–day period began on September 9, 1995, when he received the denial of his request for reconsideration of his termination. Defendants, on the other hand, argue that the 45–day period began prior to September 9, 1995, thus barring Martí's Title VII claim. Defendants contend that the 45–day period began on November 16, 1994, the date on which Martí received the letter initially proposing his dismissal from the FBI. In the alternative, they argue that the period began on March 6, 1995, the date on which Martí received his actual letter of dismissal from the FBI.

■ Under Title VII, statutes of limitations start to run at " 'the time of the discriminatory acts, not [at] the time at which the consequences of the acts became most painful.' " *Johnson v. General Electric*, 840 F.2d 132, 134 (1st Cir.1988) (quoting *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). The analyses in *Johnson* and *Ricks* make clear that whatever may be

the date on which the 45–day period began, it is certainly *not* September 9, 1995.

In *Johnson*, the First Circuit grappled with whether a Title VII statute of limitations starts to run at the time that an employer institutes an allegedly discriminatory employment plan or at the time that the plan's application actually works upon the plaintiff a denial of some benefit or position. *Johnson*, 840 F.2d at 134. According to the First Circuit, the time period begins running at the time that "some tangible effects of the discrimination [are] apparent to the plaintiff." *Id.* at 137. In the instant case, Martí felt tangible effects of Defendants' alleged discrimination when he received the letter dismissing him from the FBI on March 6, 1995.

The Supreme Court in *Ricks* faced the question of when a Title VII claim accrues: at the time of the employee's being informed by his employer of the employment decision or at the time that the employment decision actually took effect. *Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431. The Court decided that "the only alleged discrimination occurred—and the filing limitations period[ ] therefore commenced—at the time the [employment] decision was made and communicated to [the plaintiff]." *Id.* at 258, 101 S.Ct. 498. Again, Martí learned of the FBI's actual employment decision on March 6, 1995.

■ Of course, the 45–day period can not have begun prior to Martí's notice of the allegedly *discriminatory nature* of the employment decision taken against him. Martí can not be expected to have taken action before he "was or should have been aware that he was being unlawfully discriminated against...." *Provencher v. CVS Pharmacy, Div. of Melville Corp.*, 145 F.3d 5, 14 (1st Cir.1998). Indeed, Martí argues that he only became aware of the discriminatory nature of Defendants' actions on September 9, 1995, the day on which he received the letter denying his request for reconsideration of his dismissal. Unfortunately for Martí, even taking this factual assertion as true, Martí cer-

tainly *should* have been aware of the alleged discrimination well before September 9, 1995.

 Martí should have been aware of the alleged discrimination against him because at the time of his proposed termination, he knew all of the facts relevant to his belief that he was being discriminated against. Martí alleges that he was aware of rumors about SAC Schwein's dislike for Hispanics and his desire to replace Hispanic agents with Anglo–Saxon agents. Martí further alleges that he was aware that SAC Schwein commenced a campaign of ethnicity-based hostility against Martí upon SAC Schwein's arrival at the San Juan FBI office.[6] In spite of this, Martí alleges that it was not until he received from the FBI the letter denying his request for reconsideration that he appreciated the discriminatory nature of his dismissal.[7] Regardless of this allegation, Martí simply should have been aware of the alleged discrimination before this time.

 Martí attempts to explain his neglect by arguing that he was misled into not taking legal action. Thus, according to Martí, equitable tolling should create an exception to the strict enforcement of the 45–day deadline. First, he alleges that he consulted ASAC Pesquera in the wake of the November 16, 1994 letter. ASAC Pesquera, Martí claims, counseled him not to worry about his concerns about SAC Schwein's possibly discriminatory role in Martí's looming dismissal.

Second, Martí alleges that he also consulted SAC Schwein. SAC Schwein denied having any involvement with the FBI's proposed decision to terminate Mar-

tí. Martí further alleges that SAC Schwein communicated to him an interest in helping him appeal the proposed termination and suggested that Martí resign rather than being dismissed.

 Martí's allegations, however, are not sufficient to invoke equitable tolling. Martí to be entitled to equitable tolling, he must allege

> at the least, not only that he had no reason to be aware of his employer's improper motivation when the putative violation occurred, but also that the employer actively misled him and that he relied on the (mis)conduct to his detriment.

*Jensen v. Frank,* 912 F.2d 517, 521 (1st Cir.1990). ASAC Pesquera's counsel to Martí, however unwise, does not constitute active misleading. Neither does SAC Schwein's denial of responsibility for Martí's proposed termination involve any active misleading that would in any way impede Martí's ability take legal action regarding his proposed termination by the FBI. Further, SAC Schwein's professed interest in helping Martí, even if disingenuous, did not actively mislead Martí from consulting an EEOC counselor. Finally, in light of the fact that Martí has asserted that he was aware of SAC Schwein's alleged anti-Hispanic predilections, Martí can not argue that he had *no reason* to be aware of SAC Schwein's improper motivation when Martí learned of his proposed dismissal (taking as true Martí's allegation that SAC Schwein was even involved in his dismissal).

Martí argues in his Opposition to Defendants' Motion to Dismiss Plaintiff's

---

**6.** According to Martí, this campaign included unfair criticism of his performance and derision of his English language skills. Although discrimination on the basis of one's language or accent can ground a Title VII claim for national origin discrimination, Martí's claim is time-barred. See *Smothers v. Benitez,* 806 F.Supp. 299, 307–08 (D.P.R.1992).

**7.** Martí claims that he was made even more acutely aware of the discriminatory nature of

his termination when he learned in early October of 1995 that an Anglo–Saxon agent named Bradley Meads had been appointed to his former position as Principal Legal Advisor of the San Juan FBI office. This is irrelevant to Martí's timing argument, though, as he claims that he became fully aware of the discriminatory nature of his termination on September 9, 1995.

Amended Complaint, that the continuing violation doctrine prevents his Title VII claim from being time-barred. Martí makes the conclusory assertion that "[a]s stated in his Amended Complaint, defendants have participated in a series of continuing violations of his rights." Dkt. No. 23. Martí then proceeds to set forth a version of the requirements for making out a continuing serial violation. Martí neglects, however, to allege facts that support his claim of a continuing violation. In fact, after setting forth the requirements for showing a continuing serial violation, Martí simply winds his way through a confusing recitation of few facts and many conclusions, none of which support his continuing violation theory. See *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir.1999) (quoting *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996) (holding that "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited")); *Judge v. City of Lowell*, 160 F.3d 67, 78 (1st Cir.1998); *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 39 (1st Cir.1998); *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990).

■ Even assuming that Martí had coherently argued for the existence of a continuing violation, Martí has not alleged facts sufficient to support a continuing violation. A continuing violation can be either serial or systemic. *Provencher*, 145 F.3d at 14. A continuing serial violation "occurs where a chain of similar discriminatory acts emanating from the discriminatory animus exists and where there has been some violation within the statute of limitations period that anchors the earlier claims." *Provencher*, 145 F.3d at 14. See also, *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 53–54 (1st Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000). Martí has simply not

pointed to any discriminatory act within the limitations period. The only events that occurred during the limitations period were Martí's receipt of the letter denying his request for reconsideration and Martí's finding out that Bradley Meads had been appointed to Martí's former position. Martí's receipt of the letter is "[m]erely [the] residual effect[ ] of past discriminatory conduct ... [and is] not [itself an] act[ ] of discrimination and therefore will not satisfy the anchor violation requirement." *Provencher*, 145 F.3d at 5.

■ A continuing systemic violation, on the other hand, is based not on a series of discriminatory acts but rather on "a discriminatory policy or practice." *Provencher*, 145 F.3d at 14 (quoting *Jensen*, 912 F.2d at 523). Further, "so long as the policy or practice itself continues into the limitation[s] period, a challenger may be deemed to have filed a timely complaint." *Id.* Unlike a continuing serial violation, a continuing systemic violation "requires no identifiable act of discrimination during the limitations period." *Provencher*, 145 F.3d at 14. Here, though, Martí has failed to argue the theory of a continuing systemic violation. Thus, the Court shall not decide whether such a violation exists in this case. See *Cruz–Erazo v. Rivera–Montañez*, 212 F.3d 617, 622, n. 3 (1st Cir.2000) (stating that when a litigant has failed to raise a legal argument, "we think neither [the district nor the circuit] court is obliged to dream up and articulate [litigants'] arguments for them").

■ The foregoing analysis leads to the ineluctable conclusion that the 45–day period started to run when Martí was informed of his dismissal on March 6, 1995. It is undisputed that Martí did not seek EEOC counseling until October 23, 1995, over seven months later. Martí's Title VII claim is thus time-barred.[8]

---

8. The Court notes that although reasonable minds could differ as to the fairness of Martí's dismissal, the Court's role is to determine whether Martí has a legally cognizable cause of action and not to decide whether he was fairly treated or not.. See *Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 214 F.3d 1, 4 (1st Cir.2000) (pointing

### Conclusion

The Court hereby grants Defendants' Motion to Dismiss Martí's claim of deprivation of property without due process of law, his claim of deprivation of liberty without due process of law, his equal protection claim, and his Title VII claim. Accordingly, all of Martí's claims are hereby dismissed with prejudice. Judgment shall be entered accordingly.

---

out that an "unfair" dismissal alone can not ground a Title VII claim and that Title VII "was not designed to transform courts into 'super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions'" (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991))).