**Sylvia DIFFENDERFER,**
**et al., Plaintiffs,**

v.

**Ramón E. GÓMEZ–COLÓN,**
**et al., Defendants.**

**Civil No. 08–1918 (JAF).**

United States District Court,
D. Puerto Rico.

Sept. 2, 2008.

---

Claudio Aliff–Ortiz, Michael C. McCall, Simone Cataldi–Malpica, Aldarondo & Lopez Bras, Guaynabo, PR, for Plaintiffs.

## OPINION AND ORDER

JOSÉ ANTONIO FUSTÉ, Chief Judge.

Plaintiffs, Sylvia Diffenderfer and Robert McCarroll, bring this action on behalf

of themselves and as representatives of a class of eligible voters in Puerto Rico who do not speak Spanish, against Defendants, Ramón Gómez–Colón, President of the State Electoral Commission of the Commonwealth of Puerto Rico ("SEC"); Gerardo Cruz–Maldonado, Electoral Commissioner of the Popular Democratic Party ("PDP"); Juan Dalmau–Rodríguez, Electoral Commissioner of the Puerto Rican Independence Party ("PIP"); Nelson Rosario–Rodríguez, Electoral Commissioner of the Puerto Ricans for Puerto Rico Party ("PPR"); and Walter Vélez–Rodríguez, Secretary of the SEC, challenging Puerto Rico's Spanish-only ballot system. *Docket No. 1.* In addition to monetary damages and attorneys' fees, Plaintiffs seek an injunction requiring the Commonwealth of Puerto Rico to print ballots for the 2008 elections in both English and Spanish. *Id.*

For the reasons stated below, we find in Plaintiff's favor and grant injunctive relief as requested.

## I.

### *Factual and Procedural History*

Unless otherwise noted, we derive the following factual summary from the pleadings, motions, and exhibits, *Docket Nos. 1, 18, 19, 21, 25, 26, 39,* and from the facts developed at the show-cause hearing, *Docket No. 44.*[1]

According to the 2000 national census, 14.4 percent of Puerto Rico residents over age five speak only English.[2] Nevertheless, ballots for Commonwealth elections are and always have been printed in Spanish only, with three general exceptions.[3]

Lead Plaintiffs are two residents of the Commonwealth of Puerto Rico who cannot speak, understand, read or write in Spanish. Diffenderfer is a United States citizen and resident of Gurabo who has lived in Puerto Rico for the past fourteen years. She has not registered to vote or attempted to vote in previous elections because she felt that she would be unable to fill out the ballot correctly, since she does not read or understand Spanish. However, she registered to vote in the November 2008 election because she had heard that the ballots would be bilingual. McCarroll is a United States citizen and resident of Carolina who has lived in Puerto Rico for the past fifteen years. He registered to vote in Puerto Rico prior to the 2004 election and attempted to vote in 2004 but found the ballots to be confusing. Plaintiffs McCarroll and Diffenderfer seek to represent all persons in Puerto Rico who speak, understand, read, and write in English, but not in Spanish.

Defendants are members of the SEC, which is composed of a chairman and four electoral commissioners. 16 L.P.R.A.

---

1. At the hearing, surprisingly, the SEC Defendants did not testify. Instead, Defendants presented only the testimony of two lower-level employees, José Torres and Juan Colón Berlingeri, and contractor Ángel Figueroa. Defendants did not give us the benefit of any other input that would provide us with a broader factual perspective on the controversy.

2. The 2000 national census data was appended to the complaint. *Docket No. 1.* The parties did not challenge the accuracy of the census information. The 14.4 percent of Puerto Rican monolingual English speakers is

506,661. Of that population, approximately 71.4 percent are over the voting age of eighteen, meaning the number of affected voters is approximately 362,000. This court can take judicial notice of published census data. However, since the parties clearly accepted the 2000 census information, we omit any legal analysis on judicial notice.

3. In at least three previous elections, the New Progressive Party ("NPP") primaries in 2003 and 2008 and the presidential primary in 2008, the Commonwealth has had bilingual ballots.

§ 3004 (2000 & Supp.2005). Each electoral commissioner represents one of the four political parties registered with the SEC.[4] *Id.* Election regulations must be agreed upon by a unanimous vote of the commissioners; absent a unanimous decision, the chairman alone determines official policy on the matter. 16 L.P.R.A. § 3214 (2000).

At an SEC meeting on April 16, 2008, José Enríquez Meléndez Ortiz ("Meléndez"), alternate commissioner for the NPP, proposed that ballots be printed in both Spanish and English. The commissioner for the NPP stated that he was in favor of bilingual ballots, while the commissioner for the PIP opposed them. The commissioners for the PDP and the PPR both stated that they would let the SEC know the positions of their parties at a later date. The SEC chairman decided to table the issue until the second week of May 2008. However, the SEC never discussed bilingual ballots again.

Over the next several months, Meléndez repeatedly asked the SEC secretary whether the chairman had made a determination as to whether ballot materials would be printed in both English and Spanish. The secretary repeatedly responded that there had been no resolution. On July 31, 2008, the chairman issued a one-page resolution denying the request for bilingual ballots. *Pls.' Ex. 2.* The resolution adopted a 2004 resolution determining that the Voting Rights Act, 42 U.S.C. §§ 1973 to 1973aa–6, did not apply to Puerto Rico. *Pls.' Ex. 3.*

On August 19, 2008, Plaintiffs filed the present complaint in federal district court, requesting declaratory and injunctive relief, nominal damages, and attorneys' fees. *Docket No. 1.* On August 26, 2008, Defendant Gómez–Colón filed a brief, *Docket No. 18,* and Defendant Cruz–Maldonado filed a motion to dismiss, *Docket No. 20,* and a motion opposing class certification, *Docket No. 26.* On the same day, Defendant Rosario–Rodríguez filed an answer and a memorandum of law urging us to grant the injunctive relief requested by Plaintiffs. *Docket Nos. 19, 21.* Also on the same day, Plaintiffs filed a brief. *Docket No. 25.* On August 27, 2008, we held a show-cause hearing as to why we should not grant the injunctive relief requested by Plaintiffs. *Docket No. 33.*

In its pre-hearing brief and initially during the show-cause hearing, Defendants sought to establish that it would be impossible to print bilingual ballots in time for the November 2008 election.[5] However, Defendants failed to introduce any authoritative testimony to this effect. Despite Defendants' avoidance of the matter, we insisted on hearing the testimony of Ángel Figueroa, the manager of the printing company that has been contracted to print the 2008 ballots. Figueroa testified that he could print bilingual ballots in time, at an additional cost. On August 29, 2008, Plaintiffs submitted a letter from Figueroa stating that the increase in cost would be $26,472.00.[6] *Docket No. 39.*

## II.

### *Analysis*

**A.** *Jurisdiction and Trial on the Merits*

██ This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. Under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52

---

4. These parties are the NPP, the PDP, the PIP, and the PPR.

5. Puerto Rico law requires that the SEC begin printing ballots fifty-five days before the election. 16 L.P.R.A. § 3210 (2000). This year, that corresponds to September 10, 2008.

6. This submission was in direct response to our statement during the hearing that Figueroa must file a price quotation in court. We also stated that Defendants could comment on the price quote. To this date, Defendants have not objected to Figueroa's submission.

L.Ed. 714 (1908), we may grant prospective injunctive relief to prevent a continuing violation of federal law. Although Plaintiffs were not parties before the SEC, and never sought state court review, there is no exhaustion requirement to their claims.

In our Order to Show Cause, *Docket No. 5*, we stated that we expected to hear and receive all the available testimonial and documentary evidence, including any relevant testimony by Defendants. At the conclusion of the hearing, the parties did not object to our statement that they had presented all evidence relevant to the issues at bar. Therefore, there is no impediment to treating this matter as a trial on the merits under Federal Rule of Civil Procedure 65(a)(2).

### B. *Class Certification*

Plaintiffs request class certification under Federal Rule of Civil Procedure 23. *Docket No. 1*. Only Defendant Cruz–Maldonado opposes. *Docket No. 26.*

Rule 23 provides that we may certify a class if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will adequately protect the interests of the class." Fed.R.Civ.P. 23(a).

■ The class of monolingual English speakers eligible to vote in Puerto Rico is numerous enough that joinder of all members is impracticable. All members of this class are, by definition, unable to vote using a Spanish-only ballot without some assistance. All therefore possess a common legal claim for the right to use bilingual ballots. The representative Plaintiffs, Diffenderfer and McCarroll, appear to have typical constitutional claims. Finally, they both testified that they would pursue the

legal action to its conclusion; therefore, we find that they will adequately protect the interests of the class. None of Cruz–Maldonado's arguments convince us otherwise. *See Docket No. 26.*

Accordingly, we certify this case as a class action.

### C. *Statute of Limitations*

■ Defendants argue that Plaintiffs' claims are barred by Puerto Rico's one-year statute of limitations because Plaintiffs have lived in Puerto Rico for several election cycles and have not challenged Puerto Rico's Spanish-only ballot system. *Docket No. 20; see Morales–Tañon v. P.R. Elec. Power Auth.*, 524 F.3d 15, 18 (1st Cir.2008) (applying one-year statute of limitations to § 1983 claims). However, "[t]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations." *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 522 (6th Cir.1997) (quoting *Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir.1989)) (internal quotation marks omitted). Accordingly, Plaintiffs' claims for injunctive relief are not time-barred.

### D. *Merits of Federal Claims*

■ Plaintiffs raise a number of arguments against Puerto Rico's Spanish-only ballot system. Because we find that the Spanish-only ballots violate the Voting Rights Act, the Equal Protection Clause, and the First Amendment, we grant the injunctive relief requested, for the reasons stated below.

#### 1. *Voting Rights Act*

The application of the Voting Rights Act ("VRA") is a matter of first impression in a mainly Spanish-speaking jurisdiction like Puerto Rico. Section 2 of the VRA prohibits any state or political subdivision from imposing any "standard, practice, or procedure" that "results in a denial or abridge-

ment of the right of any citizen of the United States to vote" on the basis of race, color, or membership in a language minority group. 42 U.S.C. §§ 1973(a), 1973b(f)(2). Originally, the VRA applied only to practices that discriminated on the basis of race; however, in 1975 Congress extended the VRA to members of certain language minorities. Pub.L. No. 94–73, 89 Stat. 400 (1975). After the Supreme Court held that § 2 required a plaintiff to show an intent to discriminate, *Mobile v. Bolden,* 446 U.S. 55, 64, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), Congress further amended the section to prohibit any denial or abridgement of voting rights on account of race or language minority status without regard to discriminatory intent. Pub.L. No. 97–205, 96 Stat. 131 (1982); *Hernández v. Woodard,* 714 F.Supp. 963, 967 (N.D.Ill.1989) (citing *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)).

■■ Section 2 is intended to ensure that voters in the classes protected by the VRA are "free from any election practice 'which operates, designedly or otherwise' to deny them the same opportunity to participate in all phases of the political process as other citizens." *United States v. Berks County,* 277 F.Supp.2d 570, 580 (E.D.Pa.2003) (quoting S.Rep. No. 97–417, at 28 (1982), U.S.Code Cong. & Admin.News 1982, pp. 177, 205). The voting rights protected by § 2 are expansive; the section includes protection for "all action necessary to make a vote effective," including "casting a ballot and having such ballot counted properly." 42 U.S.C. § 1973*l*(c)(1). To establish a violation of § 2, a plaintiff must show that, based on the totality of the circumstances, the use of a "contested electoral practice ... results in members of a protected group having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Gingles,* 478 U.S. at 63, 106 S.Ct. 2752; *accord* 42 U.S.C. § 1973(b).

In addition to the general prohibitions of § 2, § 4 of the VRA specifically forbids certain "covered" jurisdictions from denying any citizen the right to vote due to his or her failure to comply with any "test or device" employed in the electoral process. 42 U.S.C. § 1973b. The 1975 amendments expanded the term "test or device" to include "any practice or requirement by which any State or political subdivision provide[s] any [election-related materials], including ballots, only in the English language." § 1973b(f)(3). Section 4 requires a jurisdiction to provide election-related materials, including ballots, in both English and the language of a language minority group if (1) more than five percent of voting-age citizens are members of that language minority, (2) the Attorney General found that the jurisdiction employed any test or device in the 1972 election, and (3) less than fifty percent of voting-age citizens were registered or actually voted in the 1972 election. § 1973b(b), (f)(3)-(4).

By its explicit terms, the VRA appears difficult to apply in this context. We cannot apply the requirements of § 4 because the Attorney General has made no findings with regards to whether Puerto Rico employed any test or device as a prerequisite to voting in its 1972 elections; thus, Puerto Rico is not a covered jurisdiction. Moreover, that section specifically refers to elections conducted only in English, while it is a Spanish-only ballot at issue here. Section 2 may be similarly technically inapplicable because the VRA defines "language minority" as encompassing only groups of Asian American, American Indian, Alaskan Native, or Spanish heritage. 42 U.S.C. § 1973*l*(c)(3).[7]

7. There are still more sections of the VRA that would apply here but for Congress' focus on

Congress enacted the VRA in the context of the continental United States, a society where the predominant language is English. In Puerto Rico, an officially bilingual jurisdiction and a traditionally Spanish-speaking society, it is English-monolingual individuals who are in the minority. *See Smothers v. Benitez,* 806 F.Supp. 299, 304 (D.P.R.1992). The VRA does not by its terms contemplate such a situation. However, in another context, the Supreme Court has emphasized that the VRA "should be interpreted in a manner that provides 'the broadest possible scope'" in combating discrimination. *Chisom v. Roemer,* 501 U.S. 380, 403, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (quoting *Allen v. State Bd. of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969)). "Moreover, claims under the [VRA] require 'an intensely local appraisal of the design and impact' of the challenged electoral practice." *Stewart v. Blackwell,* 444 F.3d 843, 878 (6th Cir.2006) (quoting *Gingles,* 478 U.S. at 78, 106 S.Ct. 2752). Accordingly, we find it appropriate to look to the spirit and intent of the law: eliminating discrimination on the basis of race or language minority status in voting. *See South Carolina v. Katzenbach,* 383 U.S. 301, 315, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

The result of a Spanish-only ballot in Puerto Rico is to discriminate against Plaintiffs, both on the basis of their status as a language minority and their race, in the exercise of their right to vote. Although the VRA limits the definition of "language minority" to four groups, we find it appropriate in this context, clearly not contemplated by Congress, to include the English-monolingual community in Puerto Rico as a language minority group in order to best implement the intent of the VRA. Furthermore, in accordance with our analysis under the Equal Protection Clause, *infra,* we find that a Spanish-only ballot system discriminates against Plaintiffs on the basis of their national origin, ethnicity, and/or race. Accordingly, we find that Defendants, by providing ballots only in Spanish, are in violation of § 2 of the VRA. In the alternative, even if the VRA is inapplicable *ex propio vigore,* because the VRA protects rights that are

"English-only," rather than language majority-only, elections. *See, e.g.,* 42 U.S.C. § 1973aa–1a (requiring bilingual ballots where there is a single language minority that is not English proficient and has an illiteracy rate higher than the national rate of illiteracy). Of particular interest is § 4(e), which prohibits conditioning voting on the ability to read, write, speak, or understand English for individuals educated in any state, territory, the District of Columbia, or Puerto Rico in a school where the predominant classroom language is other than English. 42 U.S.C. § 1973b(e). According to its main sponsor, the purpose of § 4(e) "was to bring the citizen of 'Puerto Rican origin into a status of equality with his fellow citizens.'" *Berks County,* 277 F.Supp.2d at 579 (quoting 111 Cong. Rec. 11160 (1965) (statement of Sen. Kennedy)). Section 4(e) has been interpreted broadly to prohibit English-only elections. *Id.* (citing cases). Section 4(e) provides additional protection to individuals educated in Puerto Rico in non-English-based schools who are literate but who do not speak English. § 1973b(e). In the present instance, we find ourselves in the inverse situation. Plaintiffs are not required to speak Spanish to be citizens of Puerto Rico; in fact, like Puerto Ricans, they may migrate freely between the mainland United States and the Commonwealth of Puerto Rico. However, they cannot take advantage of the VRA provisions providing for bilingual ballots because the English-speaking community in Puerto Rico is not illiterate and because Puerto Rico is not a "covered" jurisdiction. Although § 4(e) does not by its terms apply to Plaintiffs, they should be able to exercise their right to vote in Puerto Rico on equal par with persons born and raised on the island, in the same way that Puerto Ricans who migrate to the mainland United States are granted protections to ensure that they can exercise their right to vote there.

similarly safeguarded by the Equal Protection clause, our VRA analysis also supports a finding that a Spanish-only ballot violates the Equal Protection Clause.

### 2. *Equal Protection Clause*

■ Plaintiffs assert that a Spanish-only ballot system violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Docket No. 1.*

### a. *Equal Protection Standard*

■ The Equal Protection Clause of the Fourteenth Amendment originated in the post-Civil War era when Congress purposely intended to resolve lingering racial inequalities from disparate application of state laws; it is an instrument by which the federal government may correct official discrimination at the state, commonwealth, or territorial level. *Yick Wo v. Hopkins*, 118 U.S. 356, 369–71, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (opining that the Fourteenth Amendment guarantees equal enjoyment of fundamental liberties and privileges, including the franchise, which is the foundation to all civil rights); *see also Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665–67, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (invalidating a poll tax as a discriminatory test for wealth which is irrelevant to protecting the integrity of elections). "These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws." *Yick Wo*, 118 U.S. at 369, 6 S.Ct. 1064.

■ Under the Equal Protection Clause, racial classifications must be analyzed under strict scrutiny, meaning they must be narrowly tailored to further a compelling government interest. *Johnson v. California*, 543 U.S. 499, 505, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005) (citing *Ada-rand Constructors, Inc. v. Peña*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)). By contrast, we analyze regulations that do not classify by race or otherwise burden a suspect class or fundamental right under the rational basis test, requiring only that the regulation be "rationally related to a legitimate state interest." *Pennell v. City of San Jose*, 485 U.S. 1, 14, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988). We find that the Spanish-only ballot system in Puerto Rico does not survive either level of review.

■ First, we analyze the election regulation under strict scrutiny. Typically, when a statute burdens one race more than another, but does not make an explicit racial classification, a plaintiff must prove the existence of a discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). However, in voting rights cases, because of the fundamental importance of the right to vote, courts may apply strict scrutiny without a showing of intentional discrimination. *Coal. for Educ. in Dist. One v. Bd. of Elections of the City of N.Y.*, 370 F.Supp. 42, 55 (S.D.N.Y.1974) (finding discriminatory practices against black, Puerto Rican, and Chinese voters in New York without further inquiry into motives), *aff'd*, 495 F.2d 1090, 1092 (2d Cir.1974).

Historically, the status of English in Puerto Rico has been a highly divisive subject, largely due to significant anti-American sentiment. *See DiMarco Zappa v. Rivera Cruz*, 30 F.Supp.2d 123, 129–30 (D.P.R.1998) (explaining that differences over Puerto Rico's status vis-a-vis the United States "set[ ] apart both United States citizens born or residing in Puerto Rico and those born or residing in the other states of the Union"); *Smothers*, 806 F.Supp. at 304 (characterizing the debate over whether to include English as an official language in Puerto Rico as fueled

by anti-Americanism).[8] Given this background, the SEC's refusal to print bilingual ballots invites the strong inference that discrimination against English speakers is at play. While groups of people who share a linguistic background do not always correspond to any definite racial or ethnic group, this case implicates the electoral rights of English speakers in a predominantly Spanish-speaking jurisdiction. In Puerto Rico, use of English is frequently identified with natives of the continental United States, as a distinct national category apart from native-born Puerto Ricans, for whom Spanish remains their mother tongue. *See DiMarco Zappa*, 30 F.Supp.2d at 129–30; *Smothers*, 806 F.Supp. at 304.

■ Thus, in the context of the Commonwealth of Puerto Rico, membership in a linguistic group is essentially identical to a national, ethnic, or even racial classification. Because the policy burdens the rights of monolingual English speakers to vote on the basis of their nationality and/or race, strict scrutiny is appropriate. *See Coal. for Educ.*, 370 F.Supp. at 55.

■ The Spanish-only ballot system clearly does not withstand strict scrutiny. Defendants have proposed no compelling interests which Spanish-only elections serve to protect. By placing Plaintiffs at special risk of casting void ballots,[9] Defendants have frustrated the basic democratic precept that each voter should have equal voice in the electoral process. In upholding the franchise of English speakers in Puerto Rico, we confirm that the Equal Protection Clause protects all citizens of the United States without distinctions as to culture or geography.

Even if we apply only rational basis review, the Spanish-only ballot system cannot survive. Although the rational basis test is deferential to the government, it does not blindly condone all governmental classifications. *See, e.g., Romer v. Evans*, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (invalidating under rational review state provision prohibiting actions designed to protect homosexual persons from discrimination); *City of Cleburne v. Cleburne Living Ctr. Inc.*, 473 U.S. 432, 450, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (invalidating zoning ordinance excluding group homes for the mentally retarded); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (enjoining enforcement of amendment to Food Stamp Act rendering ineligible households containing one or more unrelated persons).

The only claimed legitimate reason to maintain a Spanish-only ballot system is Defendants' suggestion that bilingual ballots are impracticable. The sole basis on which Defendants rely is the supposed impossibility of printing ballots on certain paper stock in time for the general elections this November. At the show-cause hearing, Ángel Figueroa, the contracted printer, stated unequivocally that printing would be possible on the specified paper stock provided that the ballots are expanded along only one dimension (height), and

---

8. For the period 1902 to 1991, English and Spanish were the official languages in Puerto Rico. 1 L.P.R.A. §§ 51–55 (1982). From 1991 to 1993, the defenders of Spanish-only were able to enact legislation making Spanish the only official language. 1 L.P.R.A. §§ 56–58 (Supp.1992). In 1993, the 1991 Spanish-only legislation was repealed and English and Spanish became the official languages once again. 1 L.P.R.A. §§ 59–60 (1999).

9. Given the current state of the ballot instructions, even Spanish-speaking voters are at risk of casting void ballots. *See* Puerto Rico Election Commission, General Elections 2004, http://cee.ceepur.org/principal.aspx?Nivel=P1 (last visited Sept. 1, 2008); *see also* discussion *infra* regarding ballot confusion, Part II.3 and note 8.

that he should have enough paper stock in reserve to meet the requirements of the proposed ballot submitted by Plaintiffs. In a later submission, requested by the court during the hearing, Mr. Figueroa anticipated heightened labor costs by $26,500 due to the adjustments, without need for additional paper. *Docket No. 39–2.* However, even if the current paper stock in supply cannot meet the requirements to run bilingual ballots, we see no credible reason why other paper stock may not be obtained in time to print.

Accordingly, we find that the Spanish-only policy fails under either strict scrutiny or rational basis review. Plaintiffs' Equal Protection rights are violated by a policy that hinders monolingual English speakers in casting effective votes.

### b. *Cultural Nationalism: The Silent Discriminatory Motive*

According to our experience as a federal judge, born, raised, and educated in Puerto Rico, we find that the only logical explanation for Defendants' position against a bilingual ballot is a disguised form of discrimination rooted in cultural nationalism. Since 1898, Puerto Ricans have responded to the island's territorial relationship with the United States by espousing a form of cultural nationalism. All political factions have always believed that Puerto Ricans have a shared culture and language that must be respected and preserved, but also brings about in the daily lives of our communities the kind of discriminatory undercurrent found in this case. At odds with this notion is the fact that today, Puerto Rican society is undeniably nationally, ethnically, and linguistically diverse. According to the 2000 census, hundreds of thousands of people residing in Puerto Rico were born in the continental United States, many were born in United States Island Areas, and a large group were born abroad to American parent(s). There are also thousands of residents who are for-

eign-born. In addition, 14.4 percent of the island's total population speaks only English at home. Among these are millions of people in the island and in the mainland United States that self-identify as Puerto Rican who are either English-monolinguals, bilingual English and Spanish speakers, or code switchers of both languages. Language is no longer the sole determinant of a Puerto Rican national identity. *See generally* Jorge Duany, *The Puerto Rican Nation on the Move: Identities on the Island and in the United States* (2001); Juan Flores, *Divided Borders: Essays on Puerto Rican Identity* (1993).

Cultural nationalism—whether in Puerto Rico or the continental United States—must be reconciled with the fact that we live in a democratic system of governance that is deeply pluralist at its core. As James Madison argued, "measures are too often decided, not according to the rules of justice and the rights of the minor party, but by the superior force of an interested and overbearing majority." The Federalist No. 10 (James Madison). Federalists like Madison imagined a federal republican state that safeguarded individual liberty from majority rule. In Federalist No. 51, Madison wrote: "It is of great importance in a republic not only to guard the society against the oppression of its rulers but to guard one part of the society against the injustice of the other part. If a majority be united by a common interest, the rights of the minority will be insecure." Just as English-only initiatives in the continental United States are driven by nativist fears and prejudices, Puerto Rico's Spanish-only system grows from impermissible nationalist drives. *See* Kenya Hart, *Defending a "Death by English": English–Only, Spanish–Only, and a Gringa's Suggestions for Community Support of Language Rights,* 14 Berkeley La Raza L.J. 177, 180 (2003).

Today, we take a modest step to curb an impermissible reliance on cultural national-

ism that has the effect of preventing English-speaking residents of Puerto Rico from exercising a meaningful right to vote on equal footing with the Spanish-speaking population of the island.

### 3. *First Amendment*

■ Plaintiffs assert that the Spanish-only ballot system denies them their First Amendment right to free expression. *Docket No. 1.*

■ "The right to vote derives from the right of association that is at the core of the First Amendment." *Storer v. Brown,* 415 U.S. 724, 756, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (Brennan, J., dissenting). In evaluating a First Amendment challenge to a state election regulation, we must consider the character of the First Amendment rights at stake, and identify and evaluate the interests put forward by the state as justifications for the rule. *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (invalidating state provision imposing early filing deadline on presidential candidates); *Crawford v. Marion County Election Bd.,* —— U.S. ——, 128 S.Ct. 1610, 1616, 170 L.Ed.2d 574 (2008) (plurality opinion) (applying *Anderson* balancing test to voter eligibility requirement). We must determine "the legitimacy and strength" of each interest the state proffers, and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson,* 460 U.S. at 789, 103 S.Ct. 1564. The First Circuit has held that "federal intervention into a state election was appropriate where a significant percentage of the qualified and voting electorate was, in effect, denied its vote." *Rosselló–González v. Calderón–Serra,* 398 F.3d 1, 16 (1st Cir.2004) (citing *Griffin v. Burns,* 570 F.2d 1065, 1078–79 (1st Cir.1978)).

We begin by examining the First Amendment interests at stake. The Puerto Rico ballot is complex and difficult to understand. There are four different ways a voter can vote: a "straight vote," or a vote for all the candidates of a particular party; a "mixed vote," or a vote for the party of choice but with exceptions for some individual candidates from other parties; a "candidate vote," or a vote for candidates for each office, without selecting a party; and a write-in vote. Each of these methods has its own procedure for marking the ballot, and the distinctions are not obvious when looking at the grid in which a voter must mark his or her choices.[10] There are over 200 words in the Spanish-language instructions for the legislative electoral ballot.[11] Moreover, there

---

**10.** Indeed, the Puerto Rican ballot may create confusion for Spanish speakers as well. *See Rosselló–González,* 398 F.3d at 4–7 (describing dispute over how to tally votes in Puerto Rico's 2004 general election).

**11.** Plaintiffs submitted, as Exhibit 6C, an English translation of the Spanish instructions for the legislative electoral ballot. We produce these instructions below, as written by Plaintiffs.

> INSTRUCTIONS ON HOW TO CAST A VOTE ON THE LEGISLATIVE ELECTORAL BALLOT
> On this ballot, you have the right to vote for five (5) legislator candidates as it follows: Only one (1) candidate for Representative for District; two (2) candidates for Senators for District; only one (1) candidate for Representative at Large; one (1) candidate for Senator at Large.
> HOW TO CAST A DIRECT VOTE?
> To cast a direct vote, you only make a valid mark (X) in the provided blank under the insignia of the party of your choice and don't make any other mark on the ballot. This only mark will valid all the Legislators candidates that you have the right to vote for in this ballot. In the case for Representatives and Senators at Large, the direct vote will be accumulated in each precinct, only the candidate that's in first position in the column under the party that has been voted for the Representative in the position number 4 and the position number 10.

are three ballots in total—one for the governor and resident commissioner, one for the state legislature, and one for the municipal legislatures—each of which offers different numbers of potential selections and each of which contains a different set of instructions. Requiring non-Spanish speakers to navigate these ballots entirely in Spanish effectively limits the political participation of a significant percentage of Puerto Rico's eligible voters. *See Griffin*, 570 F.2d at 1078–79 (finding constitutional violation where voting regulation invalidated votes of a discrete group of voters constituting approximately ten percent of qualified and voting electorate).

Next, we consider the legitimacy of Defendants' asserted interests, and the extent to which these interests require limitations on Plaintiffs' First Amendment rights. We emphasize that here, unlike in rational basis review, we examine "the precise interest put forward by the [Commonwealth]." *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564. As noted *supra*, the only reasons asserted by Defendants to justify their use of Spanish-only ballots are that

printing bilingual ballots will cost more money and may be difficult to accomplish at this late date. *See Docket No. 18*. The second reason was belied by printer Ángel Figueroa's testimony at the show-cause hearing that it would be possible to print the ballots on time. The increase in cost alone does not justify a substantial burden on Plaintiffs' First Amendment right to express themselves by voting.

Accordingly, we find that Defendant's Spanish-only ballots violate the First Amendment.

### III.

### *Conclusion*

In accordance with the foregoing, we **GRANT** the injunctive relief sought by Plaintiff, *Docket No. 1*. We hereby endorse our oral order announced at the conclusion of the hearing that Defendants take all necessary steps to print the three types of ballots in Spanish and in English along the lines proposed by Plaintiffs in the model bilingual ballots that appeared in evidence as exhibits 6A, 6B, and 6C, of

HOW TO CAST A MIXED VOTE?
To cast a mixed vote, make a valid mark (X) under the insignia of the party of your choice and next to one or more candidates outside the column of your party, or write the name of the person of your choice in the last column of Direct Nomination (Write–In). Have in mind that you can't vote for more candidates than the total indicated before. (No more than one Representative for District; nor more than two Senators for District; no more than one Representative at Large; no more than one Senator at Large). It'll also become a mixed ballot, when you mark other candidates for Representatives or Senators at Large under the same column of your party that's different to the candidate in position 4 or in position number 10. When you vote Mixed, the vote that earns this different candidate, will lose it the candidate in the same position of the party for which you have voted for.

HOW TO CAST A CANDIDATURE VOTE?
When the voter has no intention to vote under the insignia of any party, and wants to vote exclusively for one or more candidates, he/she will make one valid mark (X) next to the candidate or candidates of your choice, or by write the name of other persons of these choice that are not candidates under the corresponding candidature in the Direct Nomination (Write–In) column.
HOW TO CAST A VOTE FOR INDEPENDENT CANDIDATURE?
The voter interested to vote exclusively for one or more Independent candidates can make a valid mark (X) inside the provided box named "Independent candidates". This only mark will valid all the Independent candidates in this column.
We note that this is only one set of instructions out of the three different ballots, each of which is distinct.

which official translations will be filed during the course of the day. No damages will be awarded. We award costs and attorneys' fees to Plaintiffs.

**IT IS SO ORDERED.**

*Supplement to Opinion and Order*

The attached documents are certified translations of the ballot instructions submitted as Plaintiffs' exhibits 5A, 5B, and 5C. They supplement our Opinion and Order of today. See Docket No. 49, page 22.

ATTACHMENT

Certified Translation

Janis Palma, USCCI

CV–08–1918 (JAF)

Pl Ex 5A

(Excerpt)

**INSTRUCTIONS TO CAST A VOTE ON THE STATE BALLOT**

On this ballot you have the right to vote for one candidate for Governor and one candidate for Resident Commissioner.

**HOW TO CAST A SINGLE–PARTY VOTE**

In order to vote for a single party, place a single valid "X" in the blank space under the emblem for your party of preference and make no other markings on the ballot.

**HOW TO CAST A MIXED VOTE**

To cast a mixed vote, place a valid "X" under the emblem for your party of preference and place an "X" next to the candidate outside of your party's column, or write in the name of another person of your preference for the appropriate office using the last column for Write–In Votes. Bear in mind that you can only vote for one (1) candidate for Governor and one (1) candidate for Resident Commissioner.

**HOW TO VOTE FOR INDIVIDUAL CANDIDATES**

When a voter has no interest in voting for a particular party and wants to vote exclusively for individual candidates, the voter must place a valid "X" next to the candidate or candidates of his or her preference, or may vote for others persons not listed on the ballot as candidates by writing their names under the appropriate position title using the Write–In column. Bear in mind that you may only vote for one (1) candidate for Governor and one (1) candidate for Resident Commissioner.

ATTACHMENT

Certified Translation

Janis Palma, USCCI

CV–08–1918 (JAF)

Pl Ex 5B

(Excerpt)

**INSTRUCTIONS TO CAST A VOTE ON THE MUNICIPAL BALLOT**

On this ballot you have the right to vote for one candidate for Mayor and the exact number of Municipal Legislators shown on one of the columns. If you vote for more than one Mayoral candidate or more than the number of Municipal Legislators you are entitled to elect, you will nullify your vote for those offices.

**HOW TO CAST A SINGLE–PARTY VOTE**

In order to vote for a single party, place a single valid "X" in the blank space under the emblem for your party of preference and make no other markings on the ballot. This single "X" will be valid for the Mayoral candidate and all Municipal Legislature candidates under that emblem.

## HOW TO CAST A MIXED VOTE

To cast a mixed vote, place a valid "X" under the emblem for your party of preference and place an "X" next to the candidate outside of your party's column, or write in the name of another person of your preference for the appropriate office using the last column for Write–In Votes. Bear in mind that you can only vote for one (1) candidate for Mayor and no more than the total number of Municipal Legislators listed on one of the columns.

## HOW TO VOTE FOR INDIVIDUAL CANDIDATES

When a voter has no interest in voting for a particular party and wants to vote exclusively for individual candidates, the voter must place a valid "X" next to the candidate or candidates of his or her preference, or may vote for others persons not listed on the ballot as candidates by writing their names under the appropriate position title using the Write–In column. Bear in mind that you may only vote for one (1) candidate for Mayor and no more than the total number of Municipal Legislators you are entitled to elect for this Municipality.

## HOW TO VOTE FOR INDEPENDENT CANDIDATES

A voter interested in voting exclusively for an independent candidate may place a single "X" or valid marking inside the blank square titled "Independent Candidates" and that single marking will count for all independent candidates in said column.

### ATTACHMENT

Certified Translation

Janis Palma, USCCI

CV–08–1918 (JAF)

Pl Ex 5C

(Excerpt)

## INSTRUCTIONS TO CAST A VOTE ON THE LEGISLATIVE BALLOT

On this ballot you have the right to vote for only five (5) legislative candidates, as follows: one (1) single candidate for District Representative; two (2) candidates for District Senator; one (1) single candidate for Representative At–Large; one (1) single candidate for Senator At–Large.

## HOW TO CAST A SINGLE– PARTY VOTE

In order to vote for a single party, place a single valid "X" in the blank space under the emblem for your party of preference and make no other markings on the ballot. This single "X" will be valid for all five legislative candidates you are entitled to vote for on this ballot. For Representative and Senator At–Large positions, only the candidate in the first position on the ballot under the party emblem for which you have voted will get the single-party vote for the precinct: the Representative in position No. 4 and the Senator in position No. 10.

## HOW TO CAST A MIXED VOTE

To cast a mixed vote, place a valid "X" under the emblem for your party of preference and place an "X" next to one or more candidates outside of your party's column, or write in the name of another person of your preference using the last column for Write–In Votes. Bear in mind that you may not vote for more candidates than those stated earlier. (No more than one District Representative; no more than two District Senators; no more than one Representative At–Large; no more than one Senator At–Large). This also becomes a mixed vote ballot when you place a marking for another Representative or Senator At–Large candidate in the same column for the party under which you

voted, that may be different from the one shown on position # 4 or position # 10. When casting a mixed vote, the vote you give to another candidate is lost to the candidate for that same position under the party emblem for which you voted.

## HOW TO VOTE FOR INDIVIDUAL CANDIDATES

When a voter has no interest in voting for a particular party and wants to vote exclusively for one or more candidates, the voter must place a valid "X" next to the candidates of his or her preference, or may write the name(s) of other persons of the voter's preference not listed as candidates, under the appropriate position title in the Write–In column.

## HOW TO VOTE FOR INDEPENDENT CANDIDATES

A voter interested in voting exclusively for an independent candidate may place a single "X" or valid marking inside the blank square titled "Independent Candidates" and that single marking will count for all independent candidates in said column.